Thank you very much, Your Honor. My name is Larry Westberg, and I represent Denny Ellis. He's one of the appellants here, and we're pleased with court and counsel. I first want to thank the court for changing the date of the hearing to not coincide with the trial that I had scheduled for tomorrow. The second thing is I want to apologize for my voice. I have diagnosed partial or mild laryngitis, so if you can't understand me or you can't hear me, please speak up and I'll do my best to convey to the court my thoughts. First of all, I have I want ten minutes total, and I would like to have six minutes in order to rebut what counsel for the government may have to say. You can divide the time as you wish, but only one rebuttal. Do you understand? That will be fine, then. That's the way we'll do it, Your Honor. I did not understand that, but I will do the rebuttal, then, for the six minutes. Thank you. I just want to mention two points in the few moments that I have. First is what I call the Perlman issue, which is the issue of whether, because the grand jury has expired, the district court jurisdiction to enter the contempt order deprives this court of any jurisdiction. And I believe it's very important that Perlman be addressed by this court. And the reason is, is that it isn't just this case, but it's the precedent that would be set by this decision in that if the court or if the government is allowed, once there's been a decision as there was with Judge Windmill, that Perlman did not apply and we then file a notice of appeal, if the government is allowed to then file a motion for an order to show cause and contempt, then that will just totally void Perlman, because, and the reason, of course, is for this backdoor effort by the government would be that most people who would be in the position of Mr. Torf, when they are presented with the, when they're in a Perlman position, but yet they're presented with the option, are they going to comply or not comply, most people are going to comply with the subpoena. The information is going to, not the information, the documents are going to be provided, and then the issue is going to become moot under Perlman and simply destroy the doctrine. The second issue that I want to talk about briefly in my opening remarks has to do with the immunity, the work product immunity doctrine. It applies to documents. That's Rule 26. And it talks about, and the rule talks about the purpose and the preparation of the document. I believe it's important for this Court to note that the investigative request, or the information request, excuse me, in June of 2000 asked for, as the title suggests, information, and that information was provided. Also, I would point out that the AOC that was entered in August, or agreed to in August, also provided for information, and the information was provided. The grand jury subpoena that was issued in this case brought about the production of over 3,000 pages of documents. And in the AOC, I would draw the Court's attention to page 13 and 14, which deals with paragraph 6.11, 6.13, and 6.14, which expressly, a provision that was expressly negotiated that all privileges were reserved in connection with any obligation to provide any other documents under the AOC. And with that, Your Honors, I would very much like to step back and save the balance of my time for any rebuttal. I have just six minutes to go. Thank you. John McCready, representing Ponderosa. I understand I have ten minutes. Go ahead. When it gets down to six, I'll give you the high sign. The district court's decision relies on five concessions that I supposedly made, either an oral argument or an affidavit that were filed with the district court. Two of those are not in substantial dispute. Those two are whether or not I was retained by Ponderosa to handle all environmental matters. And eventually, I was. Initially, I was retained because there was investigators and Federal officers at my client's house, at the house of the principal officer of my client. In other words, EPA and its criminal division were coming out hot and heavy. They had obtained a search warrant. They were ready to serve the search warrant, and they wanted to interview the principal of Ponderosa. I was retained at that time to defend Ponderosa. They had no idea whether we would cooperate or not cooperate. We didn't know whether the government's case was good, bad, or indifferent. I think that's one point the judge missed. The second concession, which I believe is not of substantial import, is the last concession. And that is, well, what if no attorney had been involved in this process? And by process, I mean from the beginning to the end. The day the criminal investigators showed up to the time we completed our work under the administrative order on consent, that process, what if no attorney was involved? That was a hypothetical question the judge posed to me, Judge Wynn-Millen. Even when I heard it, I thought he wanted to know whether or not there had ever been an environmental consultant privilege enacted. And I answered no. But it's a hypothetical question. It's not the type of question you bind an attorney to. It's not a fact question like did your client do such and such. It's not a specific fact question. It's hypothetical. The three important concessions that Judge Wynn-Millen concluded that I made, either in affidavits or during oral argument, are as follows. That the withheld documents, the critical phrase he used, the withheld documents that Ponderosa and Ellis assert a privilege over were prepared at counsel's direction, my direction, to comply with the information request, the surplus statutory information request issued by EPA. The second is that my client relied heavily on the withheld documents, again, that key phrase, to respond to that information request. The third supposed concession is that Ponderosa could not have complied with the information request or the administrative order on consent, again, issued by EPA under CERCLA, without the withheld documents. And I emphasize that because I think what the district court did, with all due respect to Judge Wynn-Millen, a rush to get the decision out was it substituted withheld documents for information. And that is the key distinction in this case. Those concessions cannot be supported from the evidence. They are inferences only. They are not admissions of fact, and they're clearly erroneous. Kennedy. Could Ponderosa have avoided this problem by retaining separate counsel to respond to the CERCLA request? I believe that there could have been separate attorneys to respond to the information request. But I think the key issue is there would have had to have been separate investigators, because the work product doctrine clearly covers the agents of the lawyer, the investigators. And I would have had to have two separate investigators. I would have had to have an investigator to help us. I'm talking about you having two separate investigators. I'm talking about Ponderosa Paint. I have no idea whether Ponderosa Paint is General Motors or the local grocery store in terms of size and economic impact. But could they have avoided by having, hiring you to do your internal investigation for them, and when the CERCLA investigation came in, hiring an entirely separate counsel to respond to that? I'm not sure that would have avoided the problem in this case, because the question is, is the information and the documents that Mr. Torf generated privileged? And so I think, and what I'm trying to say is, it would have required. Well, ordinarily, they would be, wouldn't they? Yes. He was, there's no question the facts support unequivocally that he was hired initially, not on May 24 of 2000, but on May 30 and May 31 of 2000, and then confirmed in a June 7 letter. He was hired to help defend the corporation. But my point is, it would have needed two separate investigators, and probably more specifically, an environmental investigator and an environmental compliance officer. The compliance officer's documents would not be privileged. The investigator's information and documents would be privileged. I don't think Congress, excuse me. One of the things that I wondered about is whether the division between the information request and the work done in anticipation of litigation is really particularly clean. I mean, wasn't the information request in essence, as you suggested, a possibly involved in future litigation as well? I believe that when EPA issues an information request, it can be and often is a precursor to litigation, civil, criminal. I think one of the dangers of this case is that EPA will be issuing administrative information requests, which it then uses to gain documents of counsel and his investigator to further a later criminal proceeding. Is the argument basically that work product relating to the information request itself is in anticipation of litigation or can be? I think the way to answer that question, and it goes back to your earlier question, is what is the relationship between the information that is work product and the information used to answer the information request? Is there a bright line? The Jump Sport decision, which we recently cited to the Court, provides some guidance in that difficult area, where you have information that probably serves dual purposes. It might be relevant and related to the information request, but it's also gathered in the anticipation of litigation. And what that case discusses is two, and I believe it provides good guidance for the application of the Adleman decision, two criteria that need to be looked at in order to determine when you have a document that might serve dual purposes, should it be protected or not? And those two criteria are, was the substantial factor for generating the document litigation? In other words, it's less bright than Adleman. Was it a substantial factor? And clearly here, the types of documents we've asserted a privilege over, the substantial reason, the factor for generating those documents was to prepare for litigation. And let me explain. To answer an information request, you just have to get the information that's asked, and you're done. You concede, do you not, and I want to be, you have no obligation to say yes. I want to be clear, given what the issue, one of the issues in this case is, you do concede that information gathered by TORG that you and your client agreed to provide the Environmental Protection Agency, to the extent that information was provided its way? Absolutely. And the best example in the record, Your Honor, is the inventory, the container inventory. And I highly encourage the judges to take a look at that container inventory. It's attached to Excerpt of Record No. 9. This is Mr. TORG's effort to go out to the old Ponderosa factory, then owned by Kelly Moore, and identify with specificity each and every leftover or bone pile, paint-related material that is there. And it identifies the container, the visible condition, the manufacturer's name, the trade product name, the product numbers, right on down the line. Why did we give that information to EPA? Because we promised to. We agreed to give that information to EPA in response to the information request. But were we under an obligation to go photograph each and every site? No. Were we under an obligation to interview the witnesses who were going to testify at the criminal trial regarding whose responsibility within the corporation it was to handle environmental matters? Because that's what the trial will likely be about. I don't want to get into defense strategy here. But what it's going to be about is who was supposed to get this job done and didn't, if in fact the job didn't get done. We didn't have an obligation to go photograph all those sites in detail. But to defend the corporation, we needed to. I only have a few minutes left. I'm going to break from the concessions. I simply don't think they're supported by the record. We provided the information we were supposed to provide to EPA, and they never complained. EPA never once said your information request response is inadequate or your compliance with the consent order is inadequate, because it wasn't. We did exactly what Ponderosa promised to do in those documents, without question. What you have here, and the question is why are we here, is EPA wanting information to support its criminal prosecution. There isn't an allegation that they need these documents to determine whether we complied with the information request. This isn't about enforcing penalties for failure to comply with an information request or a consent order. It's a way of using the civil and the administrative branch of EPA to support criminal prosecution. And it's wrong. You're now at six minutes. I have one comment to make, and then I am done. This is from the Jump Sport decision. This is my concern about what EPA is doing in this case. It talks about the second primary policy objective of the work product doctrine. It's so that attorneys work hard to find the relevant evidence. That's what the second part of the work product doctrine promotes. It's so that sharp legal thinking and theories can come about. It's about not getting into your opponent's back pocket when you don't have a reason to and stealing his mental strategies and his trial tactics. That's what this case is about. And there is a real danger that in the labor practices, the securities practices, every regulatory practice where an agency has the authority to demand an information request or issue a consent order, EPA is going to use a favorable decision in this case to get at the investigative records of attorneys and investigators who are trying to compare. I think we understand your argument. Thank you. We'll hear from the government at this time. Ms. Barton. May it please the Court, Catherine Barton with the Justice Department for the United States. Privileges are highly disfavored, and particularly in the grand jury process. And appellants bear the heavy burden, very heavy burden, of showing that the documents are protected, withheld documents are protected. All they really proffer in this case are their own self-serving statements about why they created the documents, the statements in the letter by which they hired to work and their own statements. And they proffer the documents for in-camera review. Right. They did proffer the documents for in-camera review. And the court did look at the documents. The court obviously didn't see that as inconsistent with what the documents are, which is overwhelmingly purely factual documents. And that is all the grand jury asked for. The grand jury, if you look at the subpoena language, asked for documents, records relating to work completed by Torf concerning the disposal of waste material. There is not, in fact, you have seen in our concessions, we are not seeking attorney opinions, we are not seeking opinion work product. And the district court offered, and I have that citation, offered to redact. It's in our supplemental excerpts of records, page 17. The district court said, what if I go through and carefully redact all mental impressions, all thoughts? And they said no. We've given all the information to the government that we're going to give to them. Let me talk about the title. Hello? Thompson here. Yes. Sorry. I know you know you've argued about this difference between fact and opinion. Is there something that says that only opinions are protected by attorney work product? No. No, absolutely not. Well, then why wouldn't the facts be as protectable as the opinions? The facts are as protectable as the opinion. The question here is whether the fact, whether they are work product. Yes. And that's what I was going to get to next. And let me talk about the test a little bit. And I think I'll get to that. Okay. That's fine. Right. No, I agree. We're not saying we get it just because it's factual. But we're saying the weight of the evidence is so heavy in the other direction. And part of the evidence toward the standard is that the documents are factual, is that they conceded that they had to have the documents and use them for this purpose, is that that's all the grand jury asked for, is that the affidavit of our own expert, which was not stricken, as they say in their reply brief, by the district court, says that the majority of the documents, the specific documents outlined, are the documents that would have been used in complying with the EPA requirements. So this is very heavy evidence to show, because you can't tell it was factual documents, right? I mean, they say, oh, no, we collected them for this reason. But that could create a huge loophole by which anybody could prevent, could hide, could look at the documents and then say, oh, it's factual, it's factual. So it's very heavy evidence to show that the majority of the documents were factual documents. It's not disagreeing that at the time these documents were generated, it would have not have been at all irrational or unusual that they were anticipating the criminal subpoena. No.  We're not arguing that there wasn't litigation. We're not arguing that they – we're really arguing that the but-for test, the test in this kind of case with these kinds of documents is to look at the Adelman test and determine whether the documents would have been prepared in substantially similar form but for – would not have been prepared in substantially similar form but for the litigation. And so the question is, is there a particular proceeding by its nature almost in anticipation of litigation? In other words, is there really a line like this that you can draw something from? No? Well, but these documents were – I mean, to the extent that these documents were prepared, it was prepared pursuant to a public requirement and an ordinary business activity, the cleanup of waste, which they did, and which they took the entire time that Torf was hired, they were doing the cleanup of the wastes. That is an ordinary business activity. But in fact, before they began, they knew that there was a possible criminal investigation. Right. They know both things are going on all at the same time. I mean, that is the difficulty in this case, right? The whole time they know they're threatening. What's wrong with asking Ponderosa for documents about cleanup, et cetera? Why do you have to go to Torf's lawyer and his investigator to find out this information? Why can't you go to Ponderosa? Well, Ponderosa – Tell us what you're looking for. Ponderosa hired Torf to get the information. I understand. But you tell us that what you're looking for are documents, among others, that relate to the disposal of paint materials over a certain period of time, correct? Right. What's wrong with asking Ponderosa for those records? Rather than subpoenaing Torf? Yeah. Well, I don't know the procedure. I mean, they were Torf's documents. I'm not talking about doing that to shortcut the lawyer in Torf. I mean, why can't you go directly to Ponderosa and say, we want each and every record you have that relates to the disposal of paint or paint-related material covering period X through Y? Well, we were actually being narrower by just seeking Torf's documents and not the – because that would cover the attorneys. You wanted – you wanted McCready and Torf to do your work. Well, McCready and Torf did the work anyway. Right? No, no, no. No. But this has happened – this is the way we – The reason you wanted those documents is because they had refined the universe down in their – for their own purposes to what they thought might be relevant. But, Your Honor – That's why you wanted it, right? Well, Your Honor, no, the – Torf was hired on May 31st. On May 24th, they had already commissioned a bid to dispose of wastes. On June 2nd, Torf met with EPA at the property and they ordered – they began to order a cleanup. That whole time, they are complying with – they are meeting an ordinary business duty to clean up hazardous waste and complying with public requirements pursuant to statutes. Somehow, they've created an idea – they were concerned that they could ultimately be held liable. And I agree there is this sort of dual thing going on at the same time. Ultimately, you entered a consent order of some kind, which sort of sounds like litigation. Why are you entering consent orders for things that's not litigation-like? This – this is an area in which there is always the potential for litigation. I would say that you need to step back at some level and look at what the work product doctrine – the work product doctrine is a policy-oriented doctrine. And it has to be balanced with the – with the statutes, the Resource Conservation Recovery Act and CERCLA, which require people to clean up waste. Now, they did not have to clean up the waste themselves. They could – EPA could have done it. They took advantage of – they knew they'd be in a better position if they did it themselves and signed the consent order. It's cheaper. They had the potential to control information. There's a lot of benefits to volunteering to do it themselves. And, in fact, they volunteered to do it without being ordered. And that's in the record. Maybe it's even more responsible. Right. But it is – the question is here it's an ordinary court – I mean, the judge was certainly right. The district court judge had to be right that it's an ordinary course of business duty to clean up hazardous waste. And documents that are prepared pursuant to that are not protected because they're ordinary course of business documents. They had to be prepared anyway. It depends on who gathers them, right? Excuse me? It depends on who gathers them. That's why I'm sort of mystified to this. I'm back to why can't you – you have a habit of interrupting judges when they ask questions. I know you feel very strongly about these issues and we appreciate that and we like that kind of approach. But please listen to the question. I'm still puzzled. Help me out. I'm still puzzled why you can't get this information directly from Ponderosa. Not TORF's work, but what Ponderosa has done to clean up what they did with regard to disposal, what their history, their records are that relate to this, why can't you get that information from Ponderosa? We can. They would have to give us TORF's documents. It's the same question. Ponderosa hired TORF to do the cleanup for them. There's no question about that. TORF did the work to comply with the EPA requirements. And, I mean, they managed to – I mean, maybe they even the first day intended to hire TORF in anticipation of litigation, but they immediately had him doing both things at the same time. So I'm just having a hard time understanding this. Well, first of all, let's start with this. McCready was retained and TORF hired by McCready before there was ever a request for any information of any kind, right? Two days. Well, that's before, isn't it? Right, but of course it changes. Lawyers can do a lot of work, ask their clients about their bills in two days. Well, but there's only one document that was prepared on June 1st. Yes, on June 1st. On June 2nd, EPA comes and orders the cleanup of the organic peroxide and TORF starts on it right away. I'm still back to my question. And are you telling us that there are documents relevant to cleanup and disposal that Ponderosa does not have that TORF does? Oh, well, absolutely, except they both have them.  But TORF didn't do two sets of documents. OR TORF did all the work for the cleanup. Everything they have about that we're seeking. Should I just proceed? Hang on just a second. I'm sorry. Mr. Johnson there? Are you there? Yeah, I'm here. Mr. Johnson. Oh, we thought we lost you. She was here. I'm sorry. I lost my train. The documents that we seek. At least the grand jury seeks documents pertaining to the cleanup of waste at the property. I'm sorry. I'm going to have to ask you to hold on just a second. I'm sorry. Are you not getting me? Hello? He seems to still be there. David, we're getting a message across the screen that indicates we're getting an incoming call. Oh. So are you if you don't hear if you lose us, will you we still got the picture. But if you lose your voice, will you wait? Yeah, I can see you and I can see myself. And you can and you've heard everything so far. Yes. OK. OK. I sincerely apologize. That's all right. You're right at the point where you were saying. Yes. I feel like I'm the documents are Ponderosa's documents prepared by TORF. And those are the documents that we seek all the Ponderosa's documents to clean up the waste that were prepared by TORF. Your position is that these documents are once similar to them would have been prepared. Yes, that is. Two things about that. If nonetheless they were anticipated litigation, the actual content could have been different. One of the things I noticed was that judge judge district judge talked about the types of documents being likely to be prepared. But that's different from saying the documents. Right. They actually existed. This is exactly where I was hoping to start my argument. The test. Second question. Oh, good. Because my second question is. That isn't the flip side of this. That if there had been no information request, but they had hired TORF to do an investigation, anticipation of litigation, he might have done exactly the same investigation. So why aren't they entitled to the work product for that reason? Right. Okay. Let me. The test, the test is, because of test, the Adelman test, which the majority of circuits have adopted, comes from the Wright and Miller treatise. And perhaps to go back to the basic language, it's in light of the nature of the document and the factual situation in the particular case, can the document be fairly besaid to have been prepared or obtained because of the prospect of litigation. Now, there's two important things there. The nature of the document matters. The factual situation, here we have like the timing and the fact that there was a cleanup going on at the same time. We have the nature of the documents. They're purely factual documents. They're documents that we have an affidavit that says these are documents that would be used in this kind of activity. Can it fairly besaid to have been prepared or obtained because of the prospect of litigation? Fairly besaid and Adelman, well, fairly besaid is an objective. It is basically, you don't just get to say, we hired this guy to do this, and we put it in a letter, and we got him to say it in an affidavit. And even though two days later he started doing an ordinary business activity for us, documents were protected. That's not how it works. You have to have an objective examination of whether their claim, whether it can fairly besaid. The objective examination led to my conclusion, that is, that in fact they would have done or produced these same kinds of documents if there hadn't been information required. The Adelman, because the privileges are disfavored, I mean, the burden is, you know, really the flip, the question is whether, is the flip, and that's the Adelman test. Would the documents have been prepared in substantially the same form irrespective of the litigation? And if they would, they're not protected. I mean, it's exactly the opposite. And it's a very reasonable standard because there's no, there's no, it doesn't fulfill the policies of work product protection, of work product protection to protect documents that would have been prepared anyway. Let us imagine this case exactly as it is, but mentally wipe out the civil or agency request for documentation. In other words, DOJ says we're going straight criminal on this. We're opening up a grand jury. We've called up the U.S. attorney. We've got grand jury time. And the same gathering of information had occurred. Would there be any question but that it was protected? If they'd done a hazardous waste cleanup, that's an ordinary course of business activity, and all the documents in that ordinary, in that activity are, I don't actually think it matters that there was an information request or a consent order. They cleaned up the wastes and all the documents they needed, that's just any activity, any, all the documents they needed to clean up the waste, those aren't protected. That's ordinary course of business activity. I believe what they needed. And in order to get the waste, they needed to make these documents with charts and lists and so on in order to do the cleanup? Yes. Why? Yes. I believe they did. Well, you need to, because it's under CERCLA, you would have to meet the statutory standards. It would have to be, you have to determine what we really want. There's nature and quantity of hazardous waste. How the container, what condition the containers were in. They need to know all those things. And our document, our expert said that these are the documents that we would need. Would they have to take, well, the burden is on them to show that they wouldn't have to take all those photographs. They gave us some photographs and kept others all taken on the same dates. I mean, by what, the burden is on them to show protection. And photographs, there are photographs that show the wastes out at the property. Let me, I mean, I think it's really very important. There's actually, I know it's a district court case, but they've cited jump sport. We cite a case in our brief called Scout. It's a southern district for Indiana case. And it talks about the but-for case test and whether it was prepared irrespective of litigation. And it says the reason that makes sense is there's no proprietary interest to protect, no threat to the orderly and fair administration of litigation and no loss of incentive for attorneys or parties to develop their cases. If they had to have this information anyway to do the cleanup, it's not protected. Now, there is a, they draw a distinction. They talk about documents that may have opinion work product in it. And I already mentioned, that's not what we're seeking. It was offered to be redacted and we've given our backup position that, you know, we'll just take the documents that our expert had said were, which are the factual documents that are required for. Was there a hearing that got into any detail at all as to the actual documents and why X document was formulated the way it was? Did anybody put on evidence and say, this is, we did it this way because we were anticipating litigation and we would have done it that way if we wanted to. No. Did you demonstrate that, anything like that? They've never, no, they don't make their arguments based on any of the content of, particular content of the documents. They just say, we gave you the ones, we gave you, we gave you the ones you, that, you know, that you, that, and it's not even whether we have a right to them under the information request or the consent order. It's not, it's their ordinary course of business documents regardless. I mean, it's not, we're not saying there's a government, even that there has to be a government requirement to get the documents under work product doctrine. It's just, were they truly prepared in anticipation of litigation? And, and that, that's an objective test that says, can it fairly be said? And with the policies of work product doctrine factored in and the important, very important weight given to the public's right to know, especially in the grand jury context, I'm sorry, I lost my train of thought. It's, it is the, if documents that would have been prepared anyway cannot be protected. Let me, I guess, since I hit a couple other points. The only way they could have done this and protected it was to have two sets of lawyers on the stand. Two sets, yes, maybe two sets of lawyers. Maybe they could have had a separate. Does it make sense to, to, to put that cost burden on the right to get the documents even though they could have generated the same thing twice? Yeah, yes, I do believe it, it does put the burden, it is, it does make sense. I'd like to cite, while I still have time, I'd like to cite Frederick, actually, the Frederick case we have on right now. This isn't, that does talk about the risk that the party in that case ran by having their attorney do both their tax returns and representing them in litigation. And the overlap of those two, it wasn't going to protect it just because there was an, an overlap. They run the risk of having the same people do the same work. But they could have, maybe they could have had like a segregation, you know, process or something. But they don't have anything here except their own statements that, and, and which totally allows them to control the information. The, the policies under the hazardous waste rules are that the, is to put the burden on the parties responsible to do the cleanup. And that is a, has an important public policy basis which is to save the government's resources in doing the cleanup. So EPA always, constantly, commonly relies on the party doing the cleanup to gather the necessary information. And to bring work product in and say, no, EPA has to do dual duty every time and go out and gather the same information is a countervailing problem in the policy here. If they want to, if they do the cleanup, they have to, they gather the information, it's ordinary course of business information. That is our position. I'd like to point out with respect to the concessions. I mean, when, one of the concessions that, that McCready made was that he was hired not to investigate criminal liability, but to answer the information request. You can see, and, and the judge, Judge Windmill said one of his determinations was that the purpose of the documents was for the waste cleanup in response to the information request. And that's reasonably grounded. This is an abusive discretion standard, a clearly erroneous standard. He was in front of, of, of Judge Windmill. I think the concessions are, can be relied on. Excuse me. I'm running out of time. I thought it was an abusive discretion standard. What, the, the, the, the denial of the motion, the, the, this Court reviews the district court's decision in this case for abusive discretion. The factual findings relating to the concession. And the factual findings would be clearly erroneous and legal. You're a bit over your time. Yes, I am. We thank you very much for your argument. Any questions? Sorry. No, thank you. Thank you. Thank you for your argument, counsel. I should say, let's put five minutes up. It said ten for a moment, but I'll accept the five. Thank you very much. Two sets of lawyers don't make any sense. The reason they don't make any sense is that, that the lawyers aren't the decision makers. Somewhere in the company, there's got to be a decision maker. So it comes, it comes down. I don't believe it makes any sense. Can you help, can you help me with a factual thing I just may be confused about? Did Torf do any actual cleanup work? He participated in the supervision of some of the cleanup work, yes. In those documents, my next point was that, indeed, the documents were segregated. And I want to point out a possible error so the Court isn't misled. The grand jury did subpoena records from Ponderosa. And those records were all turned over. There's never been a complaint that those records were not complete. But the records were segregated. And then when the subpoena came to Torf, then those records that were, that were part, that were part of what was responsive and what wasn't privileged or wasn't under the work product immunity were provided. So if, if, if on cleanup 1A, Torf actually supervised the cleanup and prepared a report, that was produced? Yeah, oh yes, the report in October of 2000, that complete report with everything that was, that was called for. But if, but if on cleanup 1A, this is hypothetical, of course, Torf sent a, a memo to McCready, that would be covered by privilege? That's your position. Well, it, it, it would depend on why the document was produced. If the document was produced in connection with the cleanup activity and compliance, it's been produced. If it had to do with the defense and the representation of the client, then it was withheld and it's in the documents that have been provided to the magistrate and to the district court and to this Court in camera for complete review. Are you essentially arguing that we should reinstate the Mark Magistrate's decision? Oh, absolutely. Yes, absolutely. He made a very thorough analysis, very, very thorough. It took a lot of time and did an excellent job, in my opinion. But coming back now to the result. You also kind of like the result. I'm not dissatisfied with the result, Your Honor, yes. But coming back to a point that the counsel brought out that I think is important, and that is the district court, Judge Windmill, did request additional information in addition to the privilege log that was provided. And this Court has available to it, in camera, the privilege log, which has a further description of each and every one of the documents withheld and why it's important that it be withheld. So that was presented to the district court. Additional to what? Pardon me? You said he requested additional information additional to what? You said he has a privilege log. That existed all along. There was a – What additional information did he request? He requested an explanation from counsel as to why it was – what the content of it was. It was withheld. Yes. Yes. And that was in camera. That was an additional privilege log that this Court has available to it. I want to talk about the – Just a minute. But there's a kind of evidence that I was suggesting before, or perhaps it would be, why – what it is about this particular document that relates to the anticipation of litigation that presumably is supposed to be in this information. The – Judge Windmill asked that we provide an additional privilege log to add in, in camera, what was already in the record to explain further. We also made ourselves available if the court wanted – if the district court wanted to talk to us in camera for any further explanation. Could a company subject to an investigation of this kind avoid the responsibility to turn over relevant documents to the government by having the expert actually do all the work? I'd like to address the answer to that question in a different way. Sure. I think it's having to do with the policy, because one of the questions to counsel had to do with is it good policy or something, in effect, to – for the government to take the position. I think it's a much more responsible position for a company such as Ponderosa to take to cooperate with EPA. And I can assure this Court, because I represent a number of people, so does Mr. McCready, and we talked to other people, and it would be my perception that the next time this opportunity comes up, if there's a choice to cooperate or not cooperate and we lose this appeal, then that is something that good counsel need to advise their clients about, and there are going to be in the population of clients a number that are going to say, I don't want to take that risk, and there may be some attorneys that might even make that recommendation. So I think there's a very strong policy reason to not follow the district court's decision, because it's more responsible. You need to wind up. The vega affidavit that counsel referred to, I would encourage the Court to read it. I thought I was lined up. I do want to point out very quickly, it is attachment 2 to the appellee's supplemental excerpts of record, and on page 7, this is the key sentence. It says, ''Based on their description in the privilege log, the following documents would have been required to have been generated in order to comply with the consent order and have not been produced.'' That is an internally inconsistent statement made by Ms. Vega, and she does not make this affidavit of her own knowledge. She makes it on information and belief, and we don't know where she got the information and we don't know why she believes it. But we can read the document for ourselves. One sentence. I'm sorry, you're over time. I want to thank both counsel for their arguments. The case just argued will be submitted, and the Court will stand at recess for the morning. Afternoon, Judge.
judges: Thompson, Hawkins, Berzon